## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RONALD SHEARON, ET AL**                                    CIVIL ACTION

**VERSUS**                                                            No. 17-3155

**BP EXPLORATION & PRODUCTION**                      SECTION I
**INC., ET AL.**

## ORDER & REASONS

Before the Court is a motion[1] *in limine* to exclude the opinions of plaintiffs'

medical causation expert, Dr. Jerald Cook ("Cook"), filed by defendants, BP

Exploration & Production, Inc.; BP America Production Company; BP p.l.c.;

Halliburton Energy Services, Inc.; Transocean Deepwater, Inc; Transocean Holdings,

LLC; Transocean Offshore Deepwater Drilling, Inc.; Transocean, Ltd.; and Triton

Asset Leasing GmbH (collectively, "defendants"). Defendants have also filed a

motion[2] for summary judgment, contending that if the Court grants defendants'

motion *in limine*, then summary judgment will also be warranted because plaintiffs,

Ronald Shearon ("Shearon"), Patricia Maria Rye ("Rye"), minor 1, and minor 2,

(collectively, "plaintiffs"), will lack necessary expert testimony. Plaintiffs oppose[3]

both motions. For the following reasons, the Court grants the motion *in limine* and

the motion for summary judgment.

---

[1] R. Doc. No. 64 (motion *in limine*); R. Doc. No. 75 (reply).
[2] R. Doc. No. 65 (motion for summary judgment); R. Doc. No. 76 (reply).
[3] R. Doc. No. 66 (opposition to motion for summary judgment); R. Doc. No. 70 (opposition to motion *in limine*).

## I.     BACKGROUND

The instant action is a "B3" case arising out of the 2010 Deepwater Horizon oil spill in the Gulf of Mexico.[4] B3 cases involve "claims for personal injury and wrongful death due to exposure to oil and/or other chemicals used during the oil spill response (e.g., dispersant)." *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2021 WL 6053613, at *9 (E.D. La. Apr. 1, 2021) (Barbier, J.). In the course of the MDL proceedings, Judge Barbier approved the Deepwater Horizon Medical Benefits Class Action Settlement Agreement, which included a Back-End Litigation Option ("BELO") permitting certain class members to sue the defendants for later-manifested physical conditions. *Id.* at *2. The B3 plaintiffs, by contrast, either opted out of the class action settlement agreement or were excluded from its class definition. *Id.* at *10 n.3. To prevail on their claims, the "B3 plaintiffs must prove that the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response."[5]

Shearon alleges that from May 2010 through April 2012 he was employed to "put out [the] boom, skim oil, pick up oil and dispersant soaked boom, pick up tarmats and tarballs, and place oil in trash bags."[6] Shearon alleges that, following the Deepwater Horizon oil spill, he was exposed to oil and dispersants in the course of this employment as a clean-up worker[7] in multiple locations along the coast of

---

[4] R. Doc. No. 6 ("Severing 780 Cases in the B3 Pleading Bundle and Re-allotting Them Among the District Judges of the Eastern District of Louisiana") (Barbier, J.).

[5] *Id.* at 53 (noting that "proving causation will be a key hurdle for the B3 plaintiffs.").

[6] R. Doc. No. 64-2, at 3.

[7] *Id.* at 3–5.

Louisiana, and as a resident of Louisiana.[8] According to Shearon, as a result of this exposure, he suffers from, among other things, respiratory issues, eye and skin irritation, chemical burns, mood changes, anxiety, gastrointestinal issues, nerve damage, headaches, nausea, fatigue, vertigo, blurred vision, lower back and kidney issues.[9]

Rye, Shearon's wife, has asserted that, due to exposure to oil and dispersants through contact with her husband's clothing and person, and as a resident of Louisiana,[10] she suffers from digestive issues, abdominal pain, headaches, ear, nose, and throat issues, and Barrett's Esophagus.[11] Plaintiffs minor 1 and minor 2 allege exposure to crude oil and dispersants through contact with their father's clothing and person, and as a resident of Louisiana,[12] causing minor 1 to develop respiratory issues, headaches, abdominal pain, and digestive issues,[13] and minor 2 to develop respiratory issues, runny nose, sinus issues, and headaches.[14]

Plaintiffs filed the instant civil action, seeking a jury trial with respect to their claims, which include negligence under general maritime law; gross negligence under general maritime law; negligence per se under general maritime law, state and federal law; claims under Louisiana nuisance law; loss of consortium claims under

---

[8] *Id.* at 7.

[9] *Id.*

[10] R. Doc. No. 64-3, at 4, 7.

[11] *Id.*

[12] R. Doc. No. 64-4, at 4–6; R. Doc. No. 64-5, at 4–6.

[13] R. Doc. No. 64-4, at 7.

[14] R. Doc. No. 64-5, at 7.

Louisiana law; negligence, gross negligence and/or failure to warn under state law; breach of contract; and battery.[15]

To support their claim that exposure to oil and dispersants caused their health problems, plaintiffs provides a medical causation analysis completed by Cook.[16] Cook is a retired Navy physician, a fellow of the American College of Occupational and Environmental Medicine, and is board certified in occupational medicine, public health, and general preventative medicine.[17]

Cook's report utilized a "general causation approach to determine if a reported health complaint can be the result of exposures sustained in performing cleanup work" and to assess "the likelihood that occupational exposures that occurred during work in oil spill cleanup caused disease, contributed to the development of disease, affected the severity of disease, or exacerbated pre-existing disease that workers have associated with potential exposures."[18]

Cook's report is organized into five chapters. The first chapter outlines Cook's qualifications, which are not challenged.[19] The second chapter provides background on the *Deepwater Horizon* oil spill.

The third chapter describes Cook's methodology. The first step, as described in Cook's report, is to "review and analyze the available scientific literature to determine

---

[15] R. Doc. No. 1, at 19–34.
[16] R. Doc. No. 64-10.
[17] *Id.* at 5.
[18] *Id.* at 14.
[19] R. Doc. No. 64-1, at 3.

the strength of an association between environmental exposure and a health effect."[20]
Cook states that, as part of this literature review, he selected the studies included in
his general causation analysis "based on the quality of the study and study design."[21]
Finally, Cook applies the Bradford Hill factors to the selected studies to "to determine
if a cause-and-effect relationship exists or not."[22] The Bradford Hill factors, which
environmental toxicologists employ for causation analysis, include: (1) temporal
relationship; (2) strength of the association; (3) dose-response relationship; (4)
replication of findings; (5) biological plausibility; (6) consideration of alternative
explanations; (7) cessation of exposure; (8) specificity of the association; and (9)
consistency with other knowledge. *Grant v. BP Expl. & Prod., Inc.*, No. 17-4334, 2022
WL 2467682, at *4 (E.D. La. July 6, 2022) (Vance, J.) (citing Fed. Judicial Ctr.,
*Reference Manual on Scientific Evidence* 600 (3d ed. 2011)). Cook explains that
"[d]rawing causal inferences after finding an association and considering these
factors requires judgment and analysis to determine if a cause-and-effect relationship
exists or not."[23]

The fourth chapter of Cook's report recounts the history of oil spills and related
clean-up efforts and analyzes prior studies on the health effects associated with

---

[20] R. Doc. No. 64-10, at 17.
[21] *Id.* at 19.
[22] *Id.* at 24. "Sir Bradford Hill was a world-renowned epidemiologist who articulated
a nine-factor set of guidelines in his seminal methodological article on causality
inferences." *Jones v. Novartis Pharm. Corp.*, 234 F. Supp. 3d 1244, 1267 (N.D. Ala.
2017) (internal citations and quotations omitted).
[23] R. Doc. No. 64-10, at 24.

exposure to oil.[24] These studies include the National Institute for Occupational Safety and Health's ("NIOSH") 2011 final health hazard evaluation ("HHE") report on the Deepwater Horizon oil spill, the Deepwater Horizon oil spill Coast Guard cohort study, and the Gulf Long-Term Follow-Up study ("GuLF Study"). Cook, following a close analysis of the above studies, concludes that there is a relationship between oil exposure among clean-up workers and a number of dermal, ocular, neurological, and respiratory conditions.[25]

Finally, the fifth chapter contains Cook's opinions on general causation for four categories of medical conditions: (1) respiratory conditions; (2) dermal conditions; (3) ocular conditions; and (4) cancers. Ultimately, Cook concludes that a "[g]eneral causation analysis indicates that these acute and chronic [respiratory, dermal,

---

[24] *Id.* at 32.

[25] "During the response and cleanup activities, workers complained of various acute medical symptoms, including nasal congestion, cough, shortness of breath, headaches, nausea, dizziness, dermal irritation or rash, itchy and sore eyes, as well as heat-related conditions." *Id.* at 36 (discussing the results of the NIOSH HHE report); "Neurological symptoms were also noted to have a significant relationship in oil-exposed responders, including headaches, lightheadedness, difficulty concentrating, numbness/tingling sensation, blurred vision, and memory loss or confusion . . . . The cohort was also determined to have demonstrated a significant association between oil-exposed responders and hypertension, as well as chest pain, mitral valve disorders, sudden heartbeat changes, and palpitations . . . ." *Id.* at 44 (describing the "longitudinal data that shows a significant relationship between oil-exposed responders and respiratory symptoms" from the ongoing Coast Guard cohort study); Symptoms, such as coughing, wheezing, burning in nose, throat, lungs, and eyes "had a positive association with both direct work with dispersants and indirect work with dispersants . . . ." *Id.* at 59 (discussing the results of the GuLF Study).

ocular] conditions can occur in individuals exposed to crude oil, including weathered crude oil, during oil spill response and cleanup work."[26]

## II.     STANDARDS OF LAW

### A.     Motion *in Limine*

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)).

*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239,

---

[26] *Id*. at 87, 92, 99. With respect to cancers, Cook notes that "[m]ost of the studies that have been done . . . show increased prevalence in acute symptoms . . . ." However, he also notes that, because of the differing latency periods for various cancers, "[a]t this time there are no epidemiology studies that show exposures to crude oil, weathered crude oil, or dispersants cause cancer." *Id*. at 99–102.

243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires a trial court to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire*, 526 U.S. at 147.

A number of nonexclusive factors may be considered with respect to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the technique's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'" (quoting *Kumho Tire*, 526 U.S. at 152)). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

As for determining relevancy, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [under Rules 401 and 402], but also

in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702, Advisory Committee Note).

"[W]hen expert testimony is challenged under Rule 702 and *Daubert*, the burden of proof rests with the party seeking to present the testimony." *Kennedy v. Magnolia Marine Transp. Co.*, 189 F. Supp. 3d 610, 615 (E.D. La. 2016) (Africk, J.). The Court applies a preponderance of the evidence standard when performing its gatekeeping function under *Daubert. See Daubert*, 509 U.S. at 592 n.10. And the Court is not bound by the rules of evidence—except those rules concerning privileges—when doing so. *See id.*

### B.    Summary Judgment

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the

pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

If the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must then articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). These facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. If the nonmovant fails to meet their burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

## III.    LAW & ANALYSIS

### A.    Defendants' Motion *in Limine*

B3 plaintiffs have the burden of proving that "the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response." *In re Oil Spill by Oil Rig "Deepwater Horizon"*, 2021 WL 6053613, at *11; *accord Perkins v. BP Expl. & Prod., Inc.*, No. 17-4476, 2022 WL 972276, at *2 (E.D. La. Mar. 31, 2022) (Milazzo, J.).

When determining the admissibility of causation evidence in toxic tort cases, "[c]ourts use 'a two-step process . . . . First, the district court must determine whether

there is *general causation*. Second, if it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible *specific-causation* evidence.'" *Seaman v. Seacor Marine, LLC*, 326 F. App'x 721, 722 (5th Cir. 2009) (quoting *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (emphases added in *Seaman*)). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* (quoting *Knight*, 482 F.3d at 351).

With respect to general causation, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Seaman*, 326 F. App'x at 723 (quoting *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)). "A plaintiff in such a case cannot expect lay fact-finders to understand medical causation; expert testimony is thus required to establish causation." *Id.*

Defendants assert that Cook's general causation opinion should be excluded because it is unreliable to the extent that the opinion fails: (1) to identify a harmful dose of exposure to any particular chemical[27]; (2) to verify plaintiffs' diagnoses[28]; and (3) to follow accepted methodology for evaluating scientific literature.[29]

This Court will begin by addressing the defendants' first argument for finding

---

[27] R. Doc. No. 64-1, at 6–12.
[28] *Id.* at 12–13.
[29] *Id.* at 14–17.

Cook's opinion to be unreliable—namely, that the opinion does not identify a harmful level of exposure to an identified chemical and therefore cannot prove general causation. The Court agrees with this argument. The Cook report in the present case suffers from the same flaws which the Court identified in an earlier version of Cook's report excluded in *Murphy v. BP Expl. & Prod. Inc.*, No. 13-1031, 2022 WL 1460093 (E.D. La. May 9, 2022), and *Novelozo v. BP Expl. & Prod. Inc.*, No. 13-1033, 2022 WL 1460103 (E.D. La. May 9, 2022), insofar as Cook fails to identify a particular chemical and corresponding dose to which plaintiffs were exposed.

As this Court noted in *Novelozo*, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden [as to general causation] in a toxic tort case." 2022 WL 1460103, at *5 (quoting *Seaman v. Seacor Marine, LLC*, 326 F. App'x 721, 722 (5th Cir. 2009)). Several sections of this Court have subsequently concluded that "Cook's failure to identify the level of exposure to a relevant chemical that can cause the conditions asserted in plaintiff's complaint renders his opinion unreliable, unhelpful, and incapable of establishing general causation." *Moore v. BP Expl. & Prod.*, No. 17-4456, 2022 WL 3594631, at *8 (E.D. La. Aug. 23, 2022) (Vance, J.); *Grant v. BP Expl. & Prod. Inc.*, No. 17-4334, 2022 WL 2467682, at *7 (E.D. La. July 6, 2022) (Vance, J.); *see also*, *Reed v. BP Expl. & Prod., Inc.*, No. 17-3603, 2022 WL 3099925, at *3 (E.D. La. Aug. 4, 2022) (Milazzo, J.); *Favorite v. BP Expl. & Prod., Inc.*, No. 17-3192, 2022 WL 2789029, at *3 (E.D. La. July 15, 2022) (Zainey, J.); *Barkley v. BP Expl. & Prod. Inc.*, No. 13-995, 2022 WL

13

2342474, at *4 (E.D. La. June 29, 2022) (Barbier, J); *Harrison v. BP Expl. & Prod.*, No. 17-4346, 2022 WL 2390733, at *6 (E.D. La. July 1, 2022) (Morgan, J.); *Street v. BP Expl. & Prod. Inc.*, No. 17-3619, 2022 WL 1811144, at *6 (E.D. La. June 2, 2022) (Ashe, J.).

Plaintiffs address this lack of dose-response data in Cook's report by asserting that the defendants' failure to conduct dermal and biomonitoring of clean-up workers—which plaintiffs submit "would have created a quantitative exposure and dose database for these workers"[30]—is evidence that "BP consciously, or in the most favorable light negligently, avoided recording data which would show the exposure doses of spill workers."[31] Yet, as noted by other courts, the *Deepwater Horizon* oil spill Unified Area Command, which was composed of several federal and state agencies, "engaged in extensive and coordinated data collection and environmental monitoring efforts, in what has been characterized as 'the largest environmental investigation of an oil spill ever undertaken.'" *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *4 (N.D. Fla. Nov. 4, 2020), *aff'd sub nom. In re Deepwater Horizon BELO Cases*, 2022 WL 104243 (11th Cir. Jan. 11, 2022); *accord Peairs v. BP Expl. & Prod., Inc.*, No. 17-3596, 2022 WL 2817852, at *10 n.53 (E.D. La. July 19, 2022) (Vance, J.). The availability of this data "cast[s] doubt on the assertion that there is a lack of monitoring data associated with the spill." *Peairs*, 2022 WL 2817852, at *10 n.53; *see also Harrison*, 2022 WL 2390733, at *7.

---

[30] R. Doc. No. 70, at 6.
[31] *Id.* at 11.

The defendants also argue that Cook's failure to verify plaintiffs' diagnoses[32] further renders his opinion unreliable. Per the American Medical Association's *Guide to the Evaluation of Disease and Injury Causation* ("AMA Guide"):

> The first step is to establish or verify the diagnosis (i.e., determine what is wrong with the patient, or what does the patient have?). This step is accomplished by careful review of the available medical records and/or examination of the patient. [...] *Exposure becomes relevant only when the presence of disease or illness is established.*[33]

Expert testimony "must be reliable at each and every step or else it is inadmissible." *Knight*, 482 F.3d at 355. The Court's review of the relevant section of the *AMA Guide*—which defendants lodged in the record—demonstrates that the AMA's framework is a published technique with explicit standards controlling its operation. *Burleson*, 393 F.3d at 584 (discussing the nonexclusive factors for the reliability inquiry). But Cook's failure to perform step one of the AMA Guide's is concerning because "[e]xposure becomes relevant *only when the presence of disease or illness is established.*"[34] Cook's failure to establish plaintiffs' diagnoses reveals that Cook has not "reliably applied the principles and methods to the facts of this case." Fed. R. Evid. 702(d).

This deficiency is particularly concerning because "the fundamental question underlying [Cook's] testimony," and the Court's ruling on defendants' *Daubert* motion is "whether the chemicals that [plaintiffs were] exposed to and the type of exposures

---

[32] Cook's report does not mention plaintiffs—or any B3 plaintiff—specifically.

[33] Melhorn, M.D., *et al.*, *AMA Guide to the Evaluation of Disease and Injury Causation*, (2d ed.) (attached to defendants' motion as R. Doc. No. 64-11), at 578.

[34] *Id.* (emphasis added).

[plaintiffs] experienced cause [plaintiffs' illnesses]." *Knight*, 482 F.3d at 352. Without verifying plaintiffs' diagnoses, Cook has not sufficiently explained how any particular study can provide "a reliable basis for the opinion that the types of chemicals [plaintiffs were] exposed to could cause [their] particular injur[ies] in the general population." *Id.* at 353. As this Court has noted previously, "[w]hile this shortcoming is not dispositive in the Court's analysis, it is a factor that weighs against admitting Cook's opinions."

Finally, as the defendants argue in their motion *in limine* and as other sections of this Court have agreed, Cook's reliance on the "ever vs. never" binary exposure model in his report raises concerns about the reliability of his methodology. *See Grant*, 2022 WL 2467682, at *10–11. Cook's report states that "GuLF STUDY researchers . . . noted that it would be difficult to obtain accurate and comprehensive exposure information on participants" in the study as "many of the assessments would have been made months after the workers were exposed."[35] Cook also notes that NIOSH investigators researching the Deepwater Horizon spill "disregarded the self-reports of [some] workers, determining that the workers' self-reported exposures had not been likely."[36] Accordingly, as the data Cook relied upon for his "ever vs. never" exposure model itself is of suspect reliability, his analysis suffers from the same lack of reliability.

Collectively, concerns for the reliability of Cook's report based on his failure to

---

[35] R. Doc. No. 64-10, at 57.
[36] *Id.* at 42.

identify a harmful level of exposure, to verify plaintiffs' diagnoses, and to use acceptable methodology in evaluating the scientific literature referenced in his report render his opinion unreliable.

## B.   Defendants' Motion for Summary Judgment

Having determined that Cook's report should be excluded, the Court now turns to defendants' motion for summary judgment. The issue of general causation is a necessary element of plaintiffs' claims against defendants. Cook is plaintiffs' sole expert on general causation.[37] With Cook's opinion on general causation now excluded, plaintiffs lack expert testimony with respect to general causation. As a result, plaintiffs have failed to present a genuine issue of material fact with respect to their claims that their injuries were caused by exposure to oil and dispersants. Accordingly, defendants are entitled to summary judgment. *See, e.g.*, *Moore*, 2022 WL 3594631, at *11; *Reed*, 2022 WL 3099925, at *3; *Favorite*, 2022 WL 2789029, at *3; *Grant*, 2022 WL 2467682, at *12; *Barkley*, 2022 WL 2342474, at *6; *Harrison*, 2022 WL 2390733, at *7; *Street*, 2022 WL 1811144, at *7; *Novelozo*, 2022 WL 1460103, at *10.

---

[37] Plaintiffs' opposition to the defendants' motion *in limine* also notes that Dr. Rachel Jones "prepare[d] a general exposure assessment based on the available exposure data and upon the published exposure assessment literature, most of which deals specifically with exposure assessment of BP Oil Spill response workers." R. Doc. No. 70, at 4. However, Dr. Jones' report does not offer an opinion on general causation. Additionally, Dr. Jones is not a medical doctor and therefore is not qualified to opine on plaintiffs' medical diagnoses. Accordingly, Dr. Jones' report does not cure plaintiff's deficiency as to general causation evidence. *See, e.g.*, *Peairs*, 2022 WL 2817852, at *12.

## IV.    CONCLUSION

For the reasons stated herein,

**IT IS ORDERED** that the motion *in limine* to exclude the causation testimony of Dr. Jerald Cook is **GRANTED**;

**IT IS FURTHER ORDERED** that the motion for summary judgment is **GRANTED** and plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, August 25, 2022.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

18